IGNACIO CORTINA B., CARLOS LEZAMA, GUIL-
LERMO ALVAREZ MORPHY, W. HAMPTON
KATZE, HERMAN H. MAULHARDT AND JEAN
MAULHARDT, HUSBAND AND WIFE; DONALD
M. PRENTICE AND ELIZABETH PRENTICE,
HUSBAND AND WIFE; ANTONIO DI GIOVANNI
AND GANDOLFA DI GIOVANNI, HUSBAND AND
WIFE; ANNA DI GIOVANNI; CHARLES F. LA
MANTIA AND MARGARET LA MANTIA, HUS-
BAND AND WIFE; JOSEPH V. LA MANTIA AND
VERNA LA MANTIA, HUSBAND AND WIFE;
PHILLIP J. LA MANTIA AND DOROTHY LA
MANTIA, HUSBAND AND WIFE; T. ANTHONY
LA MANTIA AND PEARL LA MANTIA, HUSBAND
AND WIFE; AND PROCESS MILLERS, INC., A
NEVADA CORPORATION, APPELLANTS, *v.* CARLOS S.
F. DIEZ DE SOLLANO, JOSE MARIA BERRIO-
ZABAL, COLLIS E. DORE AND WARREN J.
ROUSSEL, RESPONDENTS.

No. 4115

March 13, 1959

336 P.2d 762

(See also Opinion on Petition for Rehearing, page 167)

*Morse, Graves & Compton,* of Las Vegas, for Appellants.

*Hawkins & Cannon* and *Marion A. Smith,* of Las Vegas, for Respondents.

# OPINION

By the Court, BADT, J.:

Plaintiffs, as stockholders of Process Millers, Inc., sought a declaratory judgment to resolve the confusion growing out of the purchase of an additional issue of corporate stock in the exercise of pre-emptive rights by the original stockholders. In the exercise of such pre-emptive rights plaintiffs had acquired stockholder voting control of the corporation, under which control they had elected a board of directors. Defendants de Sollano and Berriozabal attacked the validity of the additional stock issue, the validity of the purchase of additional stock by plaintiffs under plaintiffs' asserted pre-emptive rights, and contend that defendants were unlawfully prevented from exercising their own pre-emptive rights, which, if defendants had not been thus unlawfully frustrated, would have given defendants voting control. The trial court denied relief to plaintiffs and entered judgment in favor of defendants, holding the additional stock issue to be void.

Under the admitted facts we must hold this conclusion to be error. Such error grows out of the conclusions of the trial court as to the legal effect of the various

corporate proceedings and of the actions of individual stockholders, officers, and directors.

An analysis of the admitted facts reveals that they do not support the trial court's findings and conclusions as to what are manifestly mixed questions of facts and law.

Process Millers, Inc., had been incorporated with a capital of $30,000, consisting of 30,000 shares of the par value of $1.00 each, for the main purpose of exploiting a process of milling grain and obtaining patents for the same in the United States and elsewhere. The cash proceeds for the original stock issue had been consumed, so that an additional $10,000 was necessary, and the directors unanimously concluded that the raising of this additional money should be accomplished by increasing the capital stock from 30,000 to 40,000 shares, with the original stockholders having pre-emptive rights, proportionate to their stockholdings, to purchase the additional 10,000 shares at par. To this end the directors on February 18, 1953, at Las Vegas, Nevada, unanimously adopted resolutions calling for a meeting of stockholders to vote on the proposed increase of capital stock. A meeting of stockholders held February 18, 1953, found all 30,000 shares present. There were submitted to the meeting the resolutions of the directors calling for an amendment of the articles to increase the capital stock, whereupon the stockholders unanimously adopted resolutions amending article IV of the articles by providing for an increase of the capital from $30,000 to $40,000. The amendment included, among others, the following provisions:

"That the stockholders of this corporation be given the pre-emptory right and privilege for a period of ten (10) days from and after they are notified that the Secretary of State of Nevada has issued his certificate amending the charter of this corporation as aforesaid to determine whether or not they are to subscribe pro rata for the number of new shares to be issued by the corporation in accordance with the number of shares each stockholder now owns as of this date, and any stockholder desiring to exercise said pre-emptory privilege shall

upon the exercise thereof pay twenty-five percent (25%) of the par value of the new stock so subscribed by him and will agree to pay for the balance of said stock as follows, to wit: twenty-five percent (25%) of the par value of said new shares to be paid by said shareholder on or before May 18, August 18, and November 18, 1953, respectively.

"That in the event the present stockholders do not exercise their pre-emptory right to purchase their pro rata shares of the authorized stock of this corporation within the period of time and in the manner above stated, then and in that event the remaining stockholders who have exercised their pre-emptory right are given the further pre-emptory right to, within ten (10) days after they are notified that they have such a right, purchase pro rata all of the new authorized stock of this corporation not subscribed for."

At the same meeting de Sollano, W. Hampton Katze, and Collis E. Dore were elected directors. A directors' meeting was called for March 13, 1953, which was held at Los Angeles on that date. Directors Katze and de Sollano were present. It was announced that director Dore had been removed, whereupon Ignacio Cortina was elected to fill the vacancy. He took office at once. Thereupon the directors elected de Sollano as president, Katze as vice president and treasurer, and Cortina as secretary. The directors then unanimously passed resolutions calling for further amendment of the articles requiring all stockholders who desired to sell any of their shares first to grant a refusal to the other subsisting stockholders (details being provided in the resolutions), and calling for a submission of the proposed amendment to a meeting of stockholders. The proposed amendment also provided for calling in the old stock to the end that new certificates might be issued, pursuant to the amendment when effective, which would recite on their face such restrictions on sale of stock.

A directors' meeting of March 16, 1953, at which all directors were present—de Sollano, Cortina and Katze—was held. A further amendment of articles was recommended for the cumulating of shares in voting for

directors and calling a stockholders' meeting for March 16, 1953. Such meeting was held at which the amendment restricting sales of stock as subject to a refusal by subsisting stockholders was unanimously approved. At this point all stockholders were apparently aware of the fact that no certificate of the amendment of article IV had yet been filed.

The participation of all stockholders and directors in the stockholders' and directors' meetings last above referred to would appear to have importance and significance, even though our main problem must be devoted to the amendment of article IV providing for the increase of capital stock from 30,000 shares to 40,000 shares, the pre-emptive rights thereunder, and the notices given and the action taken by reason thereof. These we now proceed to consider.

As noted from the amendment quoted above, the pre-emptive right was required to be exercised within ten days after notice that the certificate of amendment had been issued by the secretary of the State of Nevada, with the payment down, upon such exercise, of 25 percent, and an agreement for the payment of 25 percent on or before May 18, 1953, 25 percent on or before August 18, 1953, and 25 percent on or before November 18, 1953; and that in the event of failure to exercise such right in the period and manner stated, the remaining stockholders were given the further pre-emptive right for a period of ten days after notice to purchase pro rata the new stock not subscribed for.

The confusion commenced at this point. The certificate of amendment was not issued by the secretary of the State of Nevada until May 6, 1953, and a certified copy of such amendment was filed in the office of the county clerk of Clark County, Nevada, May 9, 1953. The secretary of the corporation, on July 6, 1953, mailed notices to the stockholders advising of the filing of the certificate of amendment, directing their attention to their pre-emptive right to purchase their pro rata share of the capital and requiring that they notify the company within ten days if they desired to exercise such right and, if so, to pay within said period 50 percent of

the subscription, an additional 25 percent on August 18 and the final 25 percent on November 18, the latter two payments to be evidenced by promissory notes.

On receipt of this letter all stockholders except de Sollano and Berriozabal exercised their pre-emptive rights, made the 50 percent down payment, and forwarded notes for the third and fourth payments, except that certain stockholders took credit for certain advances to the corporation made in anticipation of receiving credits on their stock subscriptions. De Sollano and Berriozabal were entitled to purchase 3,600 shares of the new issue in accordance with their stockholding at the time. As they did not do so, notices were sent by the secretary to the other stockholders, who subscribed and paid for the 3,600 shares open to them.

(1) The first issue for determination concerns the court's holding that the entire $10,000 issue of stock provided for under the amendment to article IV and in the resolutions of directors and stockholders authorizing such amendment was void. Respondents contend that this is amply supported by the evidence and the law, that the judgment denying plaintiffs any relief must accordingly be affirmed, and that no further questions raised on the appeal need be considered.

The court's finding in this regard is as follows:

"That in amending said Articles of Incorporation it was contemplated by and was the intention of the stockholders that said stockholders would be able to subscribe to and pay for their respective shares of the additional stock to be issued by the payment of 25% of the subscription price upon subscribing thereto, and the balance thereof in installments *each three months thereafter*." (Emphasis added.)

Respondents repeatedly insist in their answering brief that it was the contemplation and the intention of the stockholders that they would be allowed to subscribe to and pay for their respective shares of the new issue by the payment of 25 percent of the subscription price upon subscribing thereto within ten days after notice, and the balance thereof in installments each three months thereafter; that the down payment could not

be demanded in excess of 25 percent and that the following payments could not be demanded until a lapse of three months after the next preceding payment. They contend that this is the method provided in article IV as amended, and that the failure to follow such method deprived them of their pre-emptive rights, and that the entire new issue was accordingly void.

If this contention were correct, it would follow that immediately upon the adoption of the stockholders' resolutions of February 18, 1953, providing for the amendment of article IV and the issue and sale of the additional 10,000 shares of stock, any issue of stock under such resolutions and amendment would necessarily be void. This is so, because the resolutions and amendment made it impossible to carry out the proceedings for the issuance and sale of new stock strictly in accordance therewith. Our statute (NRS 78.390) requires the initiation of proceedings to effect the amendment through action of the directors followed by action of the stockholders and then by a certificate executed and acknowledged by the president and secretary, certifying to the proceedings, and filed with the secretary of state, and a certified copy thereof filed in the office of the county clerk where the principal office of the corporation is situated. The amendment required a ten-day notice to be mailed to stockholders. The secretary of state's office is at Carson City. The county clerk's office is at Las Vegas. The two are some 440 miles apart. The president and secretary both resided in Mexico City, Mexico. The vice president resided in California.

At the conclusion of the stockholders' meeting of February 18, no certificate of amendment had been drawn. What would be a minimum number of days required for the drawing of the certificate, its execution and acknowledgment, its filing with the secretary of state at Carson City, the obtaining from the secretary of state of a certified copy, the filing thereof with the county clerk at Las Vegas, and the sending of the required ten-day notice does not appear. Such time in any event would have consumed a material part of the available period between February 18 and May 18. It

was impossible for three months to lapse between the first two payments. As we have noted, the certificate of amendment was not filed with the secretary of state till May 6 and the certified copy was not filed with the county clerk till May 9 and the notice was not sent out by the secretary of the corporation till July 6, 1953. No explanation is given of the reason for these delays. Some of them may be accounted for by those provisions contained in the proceedings for the amendment of articles IX, X, and XI which required the calling in of the old stock and the printing and issuance of new stock certificates reciting the amendments of the articles, all of which were authorized almost a month after the corporate proceedings amending article IV.[1] In any event there is no charge of fraud or willful misconduct as cause of the delay.

Under the circumstances recited, it is unthinkable that the entire proceedings for the amendment of article IV became meaningless as soon as they were adopted and that any stock issued thereunder necessarily would be void. Yet this would be the situation confronting the corporation and its officers, directors, and stockholders if the court's finding in this regard is sustained.

The directors and stockholders, at the meetings

[1]On March 13, 1953, the directors recommended amending the articles by adding article IX giving subsisting stockholders a right of refusal before sale of stock by any stockholder to a third person, and by adding article X prohibiting a transfer of the corporation's assets or patent rights without the vote or written consent of three fourths of the stockholders. The directors further resolved at such meeting that upon such amendment of the articles the stockholders be required to surrender their certificates within 30 days after written notice to the end that the secretary might issue in place of such certificates new certificates stating the substance of the amendments, and that no voting rights or dividend rights would exist except pursuant to the holding of such exchanged certificates. On March 16, 1953, the directors recommended a further amendment to the articles by adding article XI providing for the right of stockholders to cumulate their stock-voting rights for the purpose of voting for a single director or for voting for two or more. On March 16, 1953, a stockholders' meeting was held, with all stock present or represented in which the proposed amendments, by adding articles IX, X, and XI, were unanimously adopted.

Only one certificate of amendment was drawn, executed, and filed with the secretary of state. This included the amendment of article IV and the addition of articles IX, X, and XI.

referred to, transacted a great deal of other business, all of which was meticulously reported in the minutes. It has not been necessary to refer to these other matters, but they evidence the fact that the directors and stockholders gave careful consideration to many matters affecting the business of the corporation and were fully advised by counsel. The proceedings of the directors and the stockholders with reference to the amendments of the articles indicate an exact compliance with the requirements of the corporation statutes controlling the method of amending the articles. Only in the matter of an apparent miscalculation of time in subscribing to and paying for the new stock is any difficulty encountered. Apparently because of this, respondents now contend that the findings and judgment must be supported on the ground that respondents were deprived of exercising their pre-emptive rights for the purchase of new stock by reason of the violation of the exact conditions imposed by article IV as amended.

In contending that the crucial part of article IV, as amended, was to permit a lapse of three months between each 25 percent installment payment for the stock, respondents attempt to avoid impossibility of such a situation by contending that it is apparent that respondents, because of their ignorance of the law, assumed that the passing of the resolutions was all that was required to effect the amendment and that the subscriptions for the new stock could be at once received. If this be so, it is difficult to find prejudice. Respondents, like the other stockholders, were simply given an extension of time for the payment of their first two installments.

We therefore conclude that the delay in the call for the exercise of the pre-emptive rights, resulting from unforeseen causes not due to any fault or misconduct of any of the officers or directors, was an immaterial variance and did not in itself invalidate pre-emptive purchases of stock thereunder. Such call, through the letter of July 6, 1953, extended the time from that originally contemplated, February 18, 1953, for the exercise

of the pre-emptive rights, to July 16, 1953. It likewise extended the time for the second 25 percent payment, originally contemplated to be May 18, 1953, to July 16, 1953. It left the time for payment of the third 25 percent installment at August 18, 1953, and of the fourth 25 percent installment at November 18, 1953. The resulting extensions of time for the exercise of the pre-emptive rights and for the payments of the first and second 25 percent installments in accomplishing the same applied to all stockholders. It prejudiced none of them; in fact it was beneficial if anything at all. It does not appear that it was detrimental to the corporation itself or that it frustrated to any extent whatever the purpose of the amendment or the unanimous approval of the stockholders. It affords no support to a "finding of fact" that the issue was void. On the contrary, the only conclusion that can be drawn under the circumstances is that the variance from the exact wording of the amendment was immaterial. It is not a whole truth to say, as contended by respondents, that the secretary's notice of July 6 changed the requirement of a 25 percent down payment to a 50 percent down payment. The original provision for the down payment on February 18 and the second payment on May 18 could, of course, not be accomplished through the notice of July 6. The original dates had already passed. The July 6 notice neither increased the down payment nor did it accelerate any of the payments. The effect of the extension of time was simply that the down payment and the second payment were both due under the ten-day notice given on July 6. If, as stipulated in the agreed statement of facts, "the purpose of making the subscription price payable in installments was so that it would not be a financial burden upon the stockholders to pay for the stock," the financial burden upon all stockholders was lightened by the extension of time for the first and second installments. And if the purpose of the increase of stock and the sale of the additional 10,000 shares was because (as stipulated in the agreed facts) "the corporation became in need of money to further exploit the said

inventions," this was met by the proceedings as had. Respondents do not assert in their brief that any rights or activities of the corporation were prejudiced by the delay in putting into the corporation's treasury the proceeds of the first two installment payments. Indeed, as to any funds immediately needed, some stockholders made payment to the corporation to be credited to the anticipated payments for their stock.

(2) Respondents further contend that the secretary's notice of July 6 notifying the stockholders of the right and requirement to subscribe for the new stock was without any effect because it was not authorized or approved by the board of directors; that such notice was, accordingly, invalid and created no rights or obligations upon the corporation or the stockholders. We find no merit in this contention. It was the ministerial duty of the secretary to send out the notices as soon as the necessary facts were in his possession.

(3) Respondents further assert that the entire issue was invalid, as found by the court, because of lack of subsequent action of the directors fixing the price of the stock, either at or above par, the number of shares to be issued, the manner and terms of sale to persons other than the present stockholders in the event the present stockholders did not subscribe, and other provisions normally associated with the issue and sale of stock by a corporation—even the determination that the additional 10,000 shares should be issued. We are compelled to reject this contention. The unanimously adopted resolutions of stockholders and the amendment of the articles pursuant thereto provided all of the details necessary, and were completely effective, except as to the miscalculation of time above discussed. The authorities cited by respondents to the effect that the mere power of the corporation, under its articles or amended articles to issue stock, does not in itself authorize the issuance and sale thereof without proper authorization, are not in point.

(4) The court further found that the issuance and sale of the additional 10,000 shares as above described "prevented the defendants de Sollano and Berriozabal from subscribing to and paying for their respective pro rata shares of said additional 10,000 shares and thereby denied and violated the pre-emptive rights of said defendants de Sollano and Berriozabal as set forth in said certificate of amendment." Respondents vehemently assert again and again that such is the case. As we have seen, these respondents, like all the other stockholders, were simply afforded an extension of time to subscribe to the stock and to make their first and second payments. They never did subscribe, they made no payments, they never obligated themselves to make the future payments. In compliance with the notice of July 6, 1953, the respondents, in like manner as did all the other stockholders, mailed in their old stock and were issued new certificates containing the substance of the other amendments to the articles. However, with reference to the exercise of their right to purchase new stock, respondents instead, by letters dated July 30, 1953, but which were not delivered to the secretary till August 11, 1953, wrote the secretary of the corporation asking him to request the remaining stockholders to grant additional time to respondents to pay for their stock. This the secretary did by writing each other stockholder, conveying verbatim the said request. One stockholder, Katze, did accede, the others all refused. In such written requests for extension, de Sollano and Berriozabal each wrote that if the other stockholders did not so consent, such other stockholders could subscribe for the portion available to such other stockholders pro rata in accordance with their rights. These letters were written after consultation with their own counsel who drafted a form of letter for them to write, for which, however, they substituted their own form.

(5) Respondents next refer to the findings to the effect that none of the stockholders subscribed to or paid for their respective shares "in the manner and within the time specified" in the amendment, but received their certificates with knowledge that they were issued and

delivered "in violation of and contrary to the terms and provisions" of said amendment. Respondents then attempt to support these findings by the same contentions which we have rejected. Respondents then urge that, even if the entire issue of 10,000 shares was not void, it was at least voidable and became void as to the 3,600 shares to which respondents were entitled to subscribe and to which appellants eventually themselves subscribed as above stated. Under the circumstances recited and conclusions which we have above reached, we find no merit in this contention.

(6) The trial court found that respondents desired to and were ready, willing, and able to pay for their proportions of the new stock "in accordance with the terms and provisions of the amendment." Respondents attempt to support this finding by reason of the phrase quoted. This, however, leads us back to the questions already disposed of. The so-called finding of fact depends entirely upon the conclusion of law which we have found to be erroneous.

. (7) Respondents contend that under the circumstances recited, there could be no waiver by them (1) because they had no knowledge of their legal rights, that is, of the fact that they were not bound by the assertedly invalid requirements in connection with subscription and payment for the stock, and (2) because there can be no waiver without an intention to waive, and that respondents at no time had any intention to waive their rights. As to the first reason, we have shown that there was no violation of their legal rights. We now dispose of their second ground.

(8) We have referred repeatedly to the fact that the amendments to the articles of incorporation were accomplished by unanimous vote of all stockholders at meeting in which all of the corporate stock was represented. Other meetings and other correspondence in the record show that respondents were completely cognizant of the purpose, extent and legal effect of the amendments and of the resolutions authorizing them. To all of this they were parties. Together with all other stockholders

they were given a right to purchase their proportionate share of the new stock under the conditions provided. Indeed, de Sollano as president signed all the new certificates issued to appellants. These facts, together with the other facts recited, supply everything necessary to show appellants' intention to waive. It is clear that respondents permitted their pre-emptive rights to lapse through their failure to exercise them. Generally, and perhaps properly, this is discussed under the theory of waiver. But whether the pre-emptive rights are waived by failure to exercise them in the time and manner required, or whether such rights simply became lost to them, or whether the rights may be said to have lapsed, or whether they failed to exist because the conditions under which they might be exercised were not complied with, the result is the same. Absent any oppression, fraud, violation of trust, prevention of equal opportunity to exercise the right afforded to all other stockholders, the pre-emptive right to subscribe is lost by failure to exercise it in the manner required of all stockholders. 11 Fletcher, Cyc., Corporations, Perm. Ed., 312, sec. 5139, and cases therein cited. Such was the situation here. Pursuant to corporate proceedings in which they acquiesced, they were given the same right to subscribe to the new stock, and received the same notices reciting the conditions of such subscription, as all other stockholders. They were given the same extensions of time for the first two installments. They failed to exercise such rights, but subsequently attempted to assert the same by attacking the validity of the entire new issue, basing their entire attack upon the discrepancy (to which they were parties) in the time allotted for subscription and payment. When they failed to subscribe and pay as required, other stockholders exercised the right to subscribe for the additional stock, paid the entire price into the corporate treasury and the money was expended for corporate purposes.

[Headnote 5]

(9) Respondents contend that in any event they each had made a valid subscription. This is based on the following situation: On September 2, 1953, a directors'

meeting was held at Santa Maria, California, attended by de Sollano and Katze. De Sollano at that time advised Katze that Berriozabal had given him $420 for the exercise of his pre-emptive right to purchase the number of shares to which he was entitled under article IV, as amended, but Katze advised that he could not accept the same, as it constituted only a one-fourth payment, and that a one-half payment was required at that time pursuant to the notice. De Sollano did not have the entire $420 on hand, as part of it had been expended for air transportation and other expenses. Nor was there offered at the time any subscription by Berriozabal to his proportionate share of stock or any note or agreement for the payment of the balance. De Sollano also stated that he desired to subscribe and to make his down payment of 25 percent. Neither de Sollano nor Berriozabal at any time signed a subscription for any part of the new stock issue or any agreement to pay for same or any note evidencing the purchase price of any part thereof. De Sollano also contended that the corporation was indebted to him in sums exceeding the amount necessary for his pre-emptive payments. This, however, entirely failed of proof. It is apparent that under the amendment to article IV and under the July 6 notice requiring subscription and payment within ten days, of the first two installments, the incident of September 2, 1953, fell far short of a compliance.

(10) Berriozabal contends that even though de Sollano's rights may have been concluded by reason of the matters discussed, Berriozabal was not likewise affected. On all material points, however, Berriozabal's position is the same as that of de Sollano.

(11) Other matters contained in the lengthy briefs do not require further discussion.

We conclude that the amendment of article IV of the articles was valid; that respondents de Sollano and Berriozabal failed to exercise their pre-emptive rights to subscribe and pay for their share of the additional stock authorized; that the appellants did exercise their respective pre-emptive rights and subscribed to and paid for

the share so pre-empted, and that their respective cer-
tificates were properly and validly issued to them; that
the said stock so issued was validly voted by them in
the election of directors; that the contrary findings and
conclusions of the trial court and its judgment based
thereon must be reversed.

Collis E. Dore and Warren J. Roussel, named herein
as respondents, do not appear to be involved in this
appeal.

Reversed with costs and remanded with instructions
for the entry of findings, conclusions and judgment in
accordance with this opinion.

MERRILL, C. J., and MCNAMEE, J., concur.

---

ON PETITION FOR REHEARING

April 28, 1959                                    338 P.2d 74

## OPINION

*Per Curiam:*

Respondents have filed a petition for rehearing upon
this appeal. In our view rehearing is not warranted.    .

.

One ground, however, would seem to warrant comment.

In disposing of the contention of respondent de Sollano that he had in any event made a valid subscription to the stock, we stated in our original opinion: "De Sollano also contended that the corporation was indebted to him in sums exceeding the amount necessary for his pre-emptive payments. This, however, entirely failed of proof." The petition for rehearing takes issue with this statement and refers to various places in the record indicating that the corporation was indebted to de Sollano and had indeed actually, at a later date, made payments to him on account of such indebtedness. Perhaps our statement of there being an entire failure of proof was too cryptic.

The true issue upon this point was not whether the corporation was then actually indebted to de Sollano in some unliquidated amount for past services and miscellaneous advances. Rather, it was whether an indebtedness then existed which de Sollano as a matter of right could apply against the amount necessary for pre-emptive payments. A further study of the record in the light of the petition reinforces our view that there was a complete failure of proof that such an indebtedness existed.

Rehearing denied.